NOT DESIGNATED FOR PUBLICATION

No. 115,529

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of
J.S., YOB 2010, and
A.H. Jr., YOB 2012.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; DANIEL CAHILL, judge. Opinion filed October 21, 2016. Reversed and remanded with directions.

*Debera A. Erickson*, of Kansas City, for appellant.

*Ashley Hutton*, assistant district attorney, and *Jerome Gorman*, district attorney, for appellee.

Before HILL, P.J., PIERRON and GARDNER, JJ.

*Per Curiam*: B.S., the natural mother of J.S., born in 2010, and A.H. Jr., born in 2012, appeals from the district court's termination of her parental rights. She argues there was insufficient evidence to support the termination and the evidence that she was unfit was largely speculation and not based upon observed conduct. Before terminating parental rights, a court must find by clear and convincing evidence that the parent is unfit. K.S.A. 2015 Supp. 38-2269(a).

The State filed an application for an ex parte order of protective custody over J.S. and A.H. in May 2013. The statement of facts detailed concerns regarding B.S.'s mental health as well as the possible verbal and physical abuse of the children. J.S. and A.H. had been living with A.H.'s aunt since October 2012. The aunt reported that due to health and

1

financial reasons she could no longer care for the children. At that time, B.S. was unemployed and had just received a 30-day eviction notice.

In June 2013, the district court granted orders of temporary custody for J.S. and A.H. As a basis for its findings, the court cited the parents' mental health issues and homelessness and the fact that the family members who had been caring for the children could not continue to do so. The court made the following interim orders for B.S.: maintain stable housing and income, sign all necessary releases of information, contact her case services officer (CSO) once a month, allow monitored visits, and complete a psychosocial assessment, mental health assessment, domestic violence assessment, and parenting classes.

B.S. stipulated that A.H. and J.S. were children in need of care in July 2013. She noted she had been raised in a home with domestic and sexual violence, she had anger issues, and she had issues with stable income and housing. She agreed she could benefit from parenting classes. The court accepted B.S.'s stipulation. The court found that reintegration was a viable option at the August 2013 Disposition hearing. The court maintained the interim orders issued in June and also recommended that B.S. complete IQ testing.

A review hearing occurred in November 2013, at which time the orders remained in full force. At a permanency hearing in April 2014, the court noted the parents were working on all of the court's orders and they had "made strides towards stability and addressing the issues that brought the children into custody." Additionally, the court ordered B.S. to complete the Safe Kids program and participate in Wyandotte County Community Developmental Disabilities Organization services. At a review hearing in July 2014, the court ordered B.S. to develop a budget for her household. At a review hearing in December 2014, the court ordered B.S. to become involved with either Parents as Teachers (PAT) or parent management training (PMT). At a March 2015 permanency

2

hearing, the court noted that B.S. "ha[d] continued to work court orders but ha[d] failed to progress to overnights."

The State made a motion to terminate the parental rights of B.S. and the fathers of A.H. and J.S. on April 14, 2015. The State acknowledged B.S. had successfully completed many of the district court orders, including signing all required releases of information, providing verification of income and stable housing, keeping in contact with her case services officer, completing a psychosocial assessment, initiating classes with Parents as Teachers, completing a budget, and consistently visiting her children during unsupervised visits with no concerns. The State's concerns were that while B.S. reported attending domestic violence classes, she had not provided verification. The State was also concerned that while B.S. successfully completed the Safe Kids program, "professionals report[ed] concerns with [her] ability to grasp material." On September 16, 2015, the court terminated the rights of A.H.'s father and J.S.'s father. However, in November 2015, the court found the State had failed to prove by clear and convincing evidence that B.S.'s parental rights should be terminated.

The State made another motion to terminate B.S.'s parental rights in December 2015. We find this somewhat unusual. It appears to us that the district court's first decision was correct, and we do not see any changes of note that occurred in the following month.

The State reiterated the facts set forth in its April 2015 motion acknowledging that B.S. had complied with almost all court orders. We find this significant. The only differences between the December and April motions were: (1) B.S. had completed a domestic violence assessment and she had participated in PAT until her children aged out of the program; (2) the State still had concerns regarding B.S.'s ability to grasp the Safe Kids material and added "[p]rofessionals report [B.S.] gained very little from Safe Kids and made limited progress due to her own mental health issues"; and (3) the State had

3

many concerns about B.S.'s visitation with her children, including "several incidences where [she] inappropriately medicated the children and another occasion where the youngest child swallowed a balloon." Based on those facts, the State moved to terminate B.S.'s parental rights pursuant to K.S.A. 2015 Supp. 38-2269(b)(1) (a parent's mental deficiency renders them unlikely to care for their children) and K.S.A. 2015 Supp. 38-2269(b)(7) (failure of reasonable efforts to rehabilitate the family).

The district court heard the State's motion to terminate B.S.'s parental rights on February 19, 2016. Three parties testified:  B.S., Cynthia Moses—a clinician for Transitions Counseling Services, and Samantha Broz—a case manager for KVC.

B.S. testified she had stable income and housing. She then stated that she thought she had completed individual therapy at Keeler Women's Center with a therapist. B.S. thought that Broz was supposed to assign her another therapist because B.S. did not like the first therapist. B.S. felt the first therapist focused too much on past issues. B.S.'s CSO gave her some ways to redirect her therapy sessions to current issues. B.S. stated she felt she learned "a little bit" from PAT and the Safe Kids programs. She had worked with Moses during Safe Kids and continued to attend family therapy with Moses after she had completed Safe Kids. However, B.S. said she did not like Moses because she thought Moses was "two-faced." Later, Moses testified she had recommended terminating B.S.'s parental rights before she even engaged in therapy with B.S. or observed her with her children. Moses acknowledged this might be the reason B.S. did not trust her.

B.S. also addressed the two concerns that the State raised in its motion to terminate her parental rights—the balloon in A.H.'s diaper and the medication she gave to A.H. B.S. acknowledged a balloon had been found in A.H.'s diaper. She said she did not know that he had swallowed it because she had been cooking dinner. She said the children had played with balloons before but never swallowed one. B.S. did not recall saying "[A.H.] swallowed a balloon because he's stupid like his dad." As a result of the

4

balloon incident, B.S.'s visits with her children were changed from overnight visits to supervised visits. When B.S. administered children's medicine to A.H. for a fever she measured the dose based on his weight. She looked on the back of the medication but "didn't see the age until after it was too late." B.S. also administered cough medicine to A.H., based on his age.

Moses testified B.S. had completed the Safe Kids assessment. As a result of the Safe Kids assessment and a domestic violence assessment, Moses recommended that B.S. complete individual therapy due to trauma from her past. Moses also diagnosed B.S. with post-traumatic stress disorder and depression with some bipolar features based on the issues in her past. B.S. did not do individual therapy with Moses because she could not afford it. Because Moses was not B.S.'s individual therapist, she did not know whether B.S. had been able to deal with her past issues. B.S. and her children did family therapy with Moses. Moses stated that B.S. "engage[d] very well with the children" during activities. Her primary concern was that B.S. became frustrated and upset while dealing with toilet training issues with her sons. J.S. has some developmental problems that make it difficult for him to regulate his bowels, although it is unclear whether it is a physical or psychological issue. Moses reported that B.S. said things like "you should know when you have to go to the bathroom" or "you stink" and her criticism of J.S. "could be verbally and emotionally abusive." Other than that, Moses said that B.S. interacted appropriately with her children.

Moses felt that B.S. could take care of the children if she had "someone who was going to be there twenty-four/seven with her, three sixty-five, and . . . remind her and cue her into continuing to be aware of the way she's working with the children and her anger and frustration . . . ." However, Moses did not believe that B.S. had the support system necessary to care for the children because of B.S.'s trust issues. Moses acknowledged that, after the Safe Kids assessment but before beginning family therapy, Moses had

5

recommended that B.S.'s parental rights be terminated. Moses understood this might be the reason that B.S. did not trust her.

Broz, a case manager at KVC, testified she did not have confirmation that B.S. had ever completed individual therapy with the first therapist at Keeler Women's Center. Broz did not recall B.S. telling her that she did not like the first therapist or B.S.'s request for a new therapist. Broz noted that B.S. had overnight visits with the children until the balloon appeared in A.H.'s diaper and then the visits were changed to supervised visits. At the time of the hearing, visits were supervised in B.S.'s home. Broz said that every time they tried to move forward with the visits, "a concern c[ame] up from somebody." Broz specifically cited a negative report from Moses that prevented visitation from moving forward. Broz was concerned about the balloon and medication incidents because B.S. did not seem very concerned when they happened. Instead, B.S. responded defensively when Broz asked her about those incidents. Broz testified that when she asked B.S. about the balloon incident, B.S. said, "It's not my fault that [A.H.] swallowed a balloon, because he's stupid like his dad," and then B.S. "stormed out of the office and was very angry." When asked if this was a typical encounter with B.S., Broz replied affirmatively. Broz reported that at times B.S. had also shown up at her office unannounced, asked to speak with her, and "immediately start[ed] raising her voice and saying a whole bunch of stuff about what she's mad about." Broz reported that B.S. told her that she felt she was not getting anything out of the Safe Kids or PAT. If the court were to continue with reintegration, Broz' primary concerns were that B.S. seemed to have trouble grasping material, she would not consult people if she did not know something, she failed to recognize problems, and she seemed unwilling to address problems.

On cross-examination, Broz was asked to review the case log that she brought to court. Broz kept the log so that she would "have notes of everything that's happened on the case." Broz' notes showed very few concerns regarding B.S.'s supervised visits. There

were some concerns from the foster parents, who wanted to adopt the children, and also the concern from Moses that B.S. chastised the boys too harshly.

The district court noted that both sides agreed that B.S. substantially completed all of her court orders. The court reviewed the reasons the children were in need of care: B.S.'s stipulations she had been raised in a home with domestic and sexual violence, she had anger issues and could benefit from parenting classes, and she had issues of stable housing and income. While B.S. had addressed the issues of housing and income, the court did not think she had successfully dealt with the other two issues. The court was not concerned about the medication or balloon issues.

The district court judge seemed to place the most weight on B.S.'s failure to address her past issues and deal with the PTSD diagnosis from Moses. He stated, "at least half of the [CINC] stipulation [was] a recognition that these traumas from the past affect her ability to parent her two children . . . ." In regards to the statements B.S. made while toilet training (like "you smell poopy") the judge said the statements, out of context, were "not damning." But, he gave weight to Moses' opinion that the statements were overly harsh and scolding and they revealed how B.S.'s PTSD made her unable "to regulate her emotions and to react appropriately to her frustration and anger" and thus unable to effectively parent. The judge also thought that B.S.'s PTSD caused her trust issues and explained why Moses believed B.S. would not have the support she needed to parent.

The district court judge's other primary concern was that B.S. had not found her programs helpful. He said if it were only 1 year into the case he would have a problem finding that there was clear and convincing evidence that B.S. could not change in the foreseeable future. But, the case had been ongoing for 3 years, and B.S. still did not "recognize the impact of her childhood traumas upon her ability to care properly [] for her children." Despite making efforts, B.S. seemed to have "a block" that prevented her from "understanding . . . her own needs and her children's needs . . . ." This was bolstered

7

by the fact the judge found it credible that B.S. had said, "I don't know why I have to do therapy. I don't know why I have to do Safe Kids. And I'm not getting anything from them."

The district court found by clear and convincing evidence, under K.S.A. 2015 Supp. 38-2269(b)(1) and (b)(7), that B.S. was "an unfit parent by reason of conduct or condition which render[ed] her unable to properly care for a child. That conduct or condition [was] unlikely to change in the foreseeable future."

B.S. timely appeals.

If a child has been adjudicated to be a child in need of care, then parental rights may be terminated "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2015 Supp. 38-2269(a). The court may consider, but is not limited to, several factors listed in K.S.A. 2015 Supp. 38-2269(b). A finding of "any one of the . . . factors standing alone may, but does not necessarily, establish grounds for termination of parental rights." K.S.A. 2015 Supp. 38-2269(f).

When reviewing a district court's decision to terminate parental rights, the appellate court considers "whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that [the parent's rights should be terminated]." *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). "Clear and convincing evidence" requires the factfinder to believe "that the truth of the facts asserted is highly probable." 286 Kan. at 697. The appellate court does "not weigh conflicting

8

evidence, pass on credibility of witnesses, or redetermine questions of fact." 286 Kan. at 705.

On appeal, B.S. argues the district court incorrectly based its decision on speculative testimony from Moses. Moses' concerns regarding B.S.'s parenting ability were based on what *might* happen *if* B.S. did not address her past issues. B.S. also argues that Moses' testimony that she was abusive to her children was not supported by sufficient evidence because the only example of abuse Moses could give was that B.S. made "statements that the child was smelly when he had clearly defecated his pants . . . ." The State agrees with the court and argues that her continued issues regarding her mental illness, her mistrust and dislike of all professionals involved in her treatment, her belief that she did not need medication or therapy, and her denial of gaining any benefit from these programs" constituted sufficient evidence for the court's decision.

The district court judge relied on K.S.A. 2015 Supp. 38-2269(b)(1) ("[e]motional illness, mental illness, mental deficiency or physical disability of the parent, of such duration or nature as to render the parent unable to care for the ongoing physical, mental and emotional needs of the child") and (b)(7) ("failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family") in its decision. Here, the court cited PTSD as the condition that made B.S. unfit to be a parent. However, as B.S. argues, the evidence that PTSD affects her parenting is hardly clear and convincing.

Moses' diagnosis of PTSD was based on B.S.'s completion of Safe Kids and a domestic violence assessment. Moses also recommended terminating B.S.'s parental rights on the basis of her participation in Safe Kids, despite the fact that Moses had not yet engaged in family therapy with B.S. and her children. Furthermore, Moses was not B.S.'s individual therapist and she admitted it was possible B.S. had dealt with her PTSD. B.S.'s individual therapist did not testify. Moses' main concern was how B.S. dealt with anger and frustration. However, the only evidence that Moses presented of B.S.'s anger

9

and frustration was the fact that Moses would tell J.S. things like "You smell stinky," or, "You should know when you have to go to the bathroom," when J.S. had defecated in his pants. Moses testified that B.S. "engage[d] very well with the children" and interacted appropriately with them in all other situations.

The district court concern—that unresolved PTSD could be triggered and prevent B.S. from functioning properly—was based on speculation by Moses. For example, Moses said that people with PTSD *could* be triggered and everyday parenting situations could act as triggers. But the bathroom issue was the only example Moses could give of inappropriate parenting. In *In re D.L.*, No. 113,606, 2016 WL 1079474 (Kan. App. 2016) (unpublished opinion), a therapist testified the mother had bipolar disorder and PTSD, one of the reasons the children were in state custody was the mother's "unstable mental condition," and she had not made progress in addressing that concern. However, the *D.L.* court found: "The record supports that Mother ha[d] a mental illness, but not that it render[ed] her unable to care for her children." 2016 WL 1079474, at *5. B.S.'s situation is similar. Even if she had some sort of mental block or unresolved issues from her past, the State failed to provide evidence that B.S. was unfit to be a parent.

In many ways, this case is analogous to *In re H.J.P.*, No. 106,727, 2012 WL 1524473 (Kan. App. 2012) (unpublished decision). In *H.J.P.*, a district court terminated a father's parental rights based on his perceived inability to make progress over a 4-year period in addressing the parenting issues that resulted in the child's CINC determination. A CASA advocate testified she "felt [the father] had a violent and criminal background and if he was not able to control his anger issues with her, he would have trouble controlling his anger if H.J.P. made him mad." 2012 WL 1524473, at *3. In declaring the father unfit, the court cited the CASA advocate's concern the father's "attitude may present problems in the future when dealing with teachers and others." 2012 WL 1524473, at *3. The court just did not think that the father could handle parenting 24 hours a day, 7 days a week. The father did have three witnesses testify in his favor, but

they only had minimal interactions with him in the 2 months leading up to the termination hearing. The guardian ad litem and CASA advocate both recommended termination. The *H.J.P.* court reversed the district court's decision. 2012 WL 1524473, at *8. It reasoned that "[a]lthough the district court seemed concerned about what might happen in the future if it did not sever Father's rights, it had very little concrete evidence to support a finding of unfitness and certainly not enough to meet the higher burden of clear and convincing evidence." 2012 WL 1524473, at *7.

Here, as in *H.J.P.*, there were professionals who thought B.S.'s emotional issues rendered her unable to parent 24 hours a day, 7 days a week. But, the professionals here were also unable to provide clear and convincing evidence that B.S.'s emotional problems had interfered with her parenting, other than her frustration when dealing with J.S.'s toilet training issue.

Some distinguishing factors between *H.J.P.* and this case are that the father had at least two unsupervised visits with H.J.P. every week and H.J.P.'s foster parents testified that he was a good parent. B.S. had overnight visits, but they were changed to supervised visits after the balloon appeared in A.H.'s diaper. There was testimony that the foster parents had concerns on some of B.S.'s visits, but the foster parents did not testify so it is unclear what those concerns were. In these ways, it is more difficult to decide this case than *H.J.P.*

In addition to holding that B.S. was unfit due to mental deficiency, the district court also held there was a failure of reasonable efforts to rehabilitate the family. The court recognized that B.S. had carried out a reasonable plan, stating "if this was a IKEA picture direction of what you have to do to work towards reintegration, [B.S.] has completed each and every one of those steps." The court's concern was that B.S. admitted to learning very little (or nothing at all) from her parenting classes. The court said that B.S. seemed to have a mental block that prevented her from understanding her children's

11

needs. Again, however, there was little evidence that tied her failure to learn or her mental block into being an unfit parent. B.S. clearly had the mental capacity to obtain stable housing and income, attend all of the court-ordered classes, and successfully complete her other orders.

Finally, the district court held that B.S.'s condition was unlikely to change in the foreseeable future and it would be in the best interests of the children to terminate her parental rights.

Overall, the district court's opinion seems to be based on what might happen if parental rights were not terminated, not on the evidence of what had actually happened. This is not like many other TPR cases, as there are "no allegations of addiction, no allegation of filthy living conditions, no allegations of a dangerous relationship with a boyfriend, and no allegations of a lack of interest in the children." *In re K.R.*, 43 Kan. App. 2d 891, 904-05, 233 P.3d 746 (2010) (another case where it was alleged that a mother had "not made progress" in her conditions of reintegration). This is still a very difficult decision, because the judge and two professionals, all of whom have extensive experience with the case, recommend termination. The children have been away from B.S. for over 3 years at this point. That is half of J.S.'s life and almost all of A.H.'s life. Additionally, we must look at the evidence in the light most favorable to the State. However, because the district court and the professionals failed to prove specific, concrete examples of B.S.'s unfitness to be a parent, the evidence does not show that it is highly probable that B.S. is unfit to be a parent. B.S. "may not be the best model of motherhood," but that is not the standard that she has to meet. 43 Kan. App. 2d at 904.

Reversed and remanded for further proceedings.